The last case being argued today is Gottlieb et al. v. Lamont et al. o I see you've reserved three minutes for rebuttal. You can begin whenever you're ready. Can you hear me okay? Yes. Thank you. Thank you, Your Honor, and may it please the court. Andy Gottlieb ran for state senate in the state of Connecticut, and over a 14-day period in the heat of summer, he collected more signatures than it would have required to qualify for the ballot in a primary for governor of Ohio, congressman from Pennsylvania, or many, many other important offices throughout our country. But the office of Connecticut state senator requires more signatures to get on the ballot per day than pretty much any other office in the entire United States. And it actually requires more signatures per day to get on the ballot for state senate in a primary in Connecticut than it does to get onto a ballot for a primary for U.S. Congress. And the appellee in this case, the state of Connecticut, says that this disparity between a simple state senate seat and a U.S. Congress seat is only because the plaintiff appellants made cross-party comparisons, but this is not true. In fact- Let me ask you to take a step back. Let me see if we can agree on what the standard is for showing whether or not there's a severe burden. In the Lamont case back in 2020, we said the hallmark of a severe burden is exclusion or virtual exclusion from the ballot. We agree that that's what we're looking at here. We can talk about comparisons to other states and which state is better, but isn't the ultimate test whether there's exclusion or virtual exclusion? Yes, and we believe that- And we obviously have people who have done it successfully. And the question is whether there's even virtual exclusion when you have- They say from 2006 to 2018, 200 primaries were conducted in Connecticut, ranging from 7 to 14 per election cycle, with an average of 29. In fact, your client collected enough signatures even in the 14 days, but some of them were invalidated, which left him a little bit short. Plaintiff Bartlett gathered 1,400 signatures. Plaintiff LaCourtier got onto the primary ballot in 2020. So I'm having a hard time understanding. There's a lot of discussion about how many volunteers you would need, but if the law was just passed, maybe we'd have to try to project whether there'd be exclusion or virtual exclusion. But we have data. Why isn't that indication? It may not be as much as other states. 4% is not as good as other states, but I'm having a hard time understanding how there's virtual exclusion when all of these people have been able to do it. That was a long question, but that's my thought. It's understandable. And the question about what does it mean to be virtually excluded. I mean, obviously our candidates, except for Mr. LaCourtier, were in actuality excluded from access to a primary ballot. He was only excluded because some of them were invalidated. It wasn't because the number he had to collect was so onerous that he couldn't do it in 14 days, right? Well, looking at the entirety of the scheme and all of the laws, the reason why many signatures are excluded is because of how strict and how much red tape Connecticut places over this process. So looking at the totality of the laws, for example, the fact that each circulator has to be a party member from a municipality in the state, that each page has to be notarized, which the Supreme Court has noted is a sign of a strict regulation comparing the Ohio laws and roads to the Georgia laws in genus. In addition, this 14-day period is about a third of the time for state Senate and state representative candidates as the amount of time that Connecticut has found sufficient to guard its interests for U.S. Congress, where there's 42 days to collect them. Did your client obtain access to the Democratic primary ballot for state assembly in 2022? For the state representative seat, yes. And if you look at it, in Connecticut, the state representatives, the state house, this problem is somewhat ameliorated by the fact that Connecticut has 151 state representatives. So even though it's a very onerous requirement for state representative, since there's 151 districts in a three-and-a-half-million-person state, state representative, people overcome that. But if you look at state senator in Connecticut, which there's only 36 districts in Connecticut, has that 5 percent of those primary voters in 14 days, and you do see virtual exclusion of candidates from state Senate campaigns and state Senate elections because we certainly have the lowest rate of primaries for state Senate of any state, but also none of- Let me ask a question about that. With regard to some of the data that you've been using and that you rely on in your brief, the district court declined to certify Mr. Gottlieb as an expert, but you rely on a lot of data that he assembled in his report in his brief. Do you challenge the district court's exclusion? I didn't see that in your brief. We did not challenge the district court's exclusion. We challenged- We can't really look at the data. I mean, to the extent there are laws in other states that we can take judicial notice of, that's one thing. But other kinds of assessments that support your claim of virtual exclusion might be more questioned as part of the record. Isn't that right? I believe that the district court's conclusion, which the district court made, even considering the information presented by Mr. Gottlieb, that there was not enough to raise a genuine factual dispute, that that can be challenged because although the district court declined to consider Mr. Gottlieb as an expert, ultimately the district court did say that she made her decision reviewing the totality of the record, even though she was not considering his opinions as an expert. So she was considering where Connecticut ranks versus other states. I believe that that information was considered. We can take judicial notice of that. We don't need anybody to- We don't need an expert to see what the percentages are compared to other states. It's a closer question when looking at the rate of primaries in other states, how many candidates actually make it in Connecticut versus other states, which is very anemic. We're the last in the country in a bunch of these measures. Let me ask you, I just want to make sure I recover this other argument they make because it's a more fundamental argument, which is, and you can correct me if I'm wrong, I think based upon Lopez-Torres, there can't be any argument that selection by convention would be constitutional alone. And as you know, they make an argument that under the LaRouche case in 93, we made clear that if one method, standing alone, passes constitutional muster, any issues with the additional methods become irrelevant. So why isn't that dispositive? Why isn't the combination of Lopez-Torres saying conventions alone are enough, and our decision in LaRouche enough to say that we don't even have to examine this petition alternative? It's a two-part answer to the question. The first is that the delegate selection process in Lopez-Torres was different from the delegate selection process for conventions in Connecticut. I know, but the Supreme Court, I mean, I looked at the Lopez decision. They don't make the fact that there was primaries for the delegates in Lopez-Torres was not part of their analysis. They don't even mention it. They just talk about conventions much more generally than that. They do things that would be problematic if they compelled slates, if they prohibited unsupported candidates from attending the convention or persuading delegates. Those are the things that the Supreme Court said would be problematic in a convention. They don't say that having the delegates have primaries is part of the analysis, right? Well, actually, I do believe that in Lopez-Torres, in multiple places, the Supreme Court did emphasize that voters had the right to vote in the election for delegates to the conventions that were challenged in that case. So the Supreme Court said respondents' real complaint is not that they cannot vote in the election for delegates. Here, we cannot vote for delegates. The Supreme Court said that 500 signatures in 37 days, which is less than here, to get on the ballot for the delegate election is entirely reasonable. But that's one. They also point out in Connecticut that there is a primary for who's going to be seated as a delegate. You can have a primary at the next level, I forget what you call it. You can have a primary for the town committee, which is the body which may select the delegates in a future election. But that, I think, runs into a Cusberg and Ponticus problem where you're locking in these seats where you have to participate in multiple years of elections to participate. All right. Let's go to your second point. But the second point is once a state offers – so in Lopez-Torres, the candidate selection is by convention. In Connecticut, there is a ballot access process to get on a primary. So once you have a state-run election, a state-run primary, and Lopez-Torres says this, you can't put undue impediments on the requirements to qualify for that primary. But Lopez-Torres said that selection by convention has never been thought unconstitutional, even where the delegates were not selected by primary but were selected by party caucuses. Right. But in Connecticut – what I'm trying to say, and I'm not making it very artfully, is that Connecticut doesn't select candidates by convention. Ultimately, the convention's role is part of the regulation for access to a primary, which is a state-held election on election day run by the state. So if we only had conventions, then I think we'd have a very serious Lopez-Torres problem. We'd have our argument about how we can't qualify to be delegates. But here, the state holds primaries. And when they hold primaries, that's an opportunity for people to associate on the basis of their beliefs and their ideas, and the state cannot gatekeep so strictly. I'm way beyond my time. Thank you. All right. Thank you. You do have three minutes in rebuttal. We'll now hear from Ms. Dunley. It's very rare that lawyers have the ability to push that button and make it great. Absolutely. Good morning, Your Honors. May it please the Court? I'm Connecticut Assistant Attorney General Amna Nunley, and I represent the Connecticut Governor and the Secretary of the State. Connecticut could have one method of ballot access for major parties, but Connecticut exceeds what the Constitution requires and has three avenues. Reasonably diligent candidates appear on the primary ballot via all three avenues every election, including, in some elections, State Senate. Despite that fact, plaintiffs assert that Connecticut's ballot access requirements impose a severe burden because more candidates don't get on the ballot. But that isn't the test. The test is whether reasonably diligent candidates can get on the ballot. I think you described in your brief Connecticut's overall scheme as generous to candidates, but if we are able to look at the national data, how can we conclude that it's generous to candidates when Connecticut, every election cycle, 2014, second to last, 2016, last, 2018, third to last, 2020, last? And not only do they last, but they're half the rate of Arkansas, which is next worst. That's hardly suggesting that Connecticut has a generous, and there's never been a primary in 200 years for a U.S. representative, right? Well, that's not correct, General. There has been a primary for a U.S. representative, but not against an incumbent U.S. representative. And the ballot access requirements are the same regardless of whether there's a primary. If we are able to look at the national data, it doesn't indicate that Connecticut certainly doesn't have a generous ballot access scheme, right? Well, to make that conclusion, the court would have to draw an unreasonable inference based on the evidence in this case that Connecticut's primary access rates are because of the burden that the ballot access requirements impose and not because of any other reason that may impact that. And I would point out that the court should not consider those rates because We could look at the rates in combination with what they're arguing is a pretty high number and a pretty short period of time. So it's not just the rates because there could be a lot of factors where people, for whatever reason, don't want to run in primaries in a particular state because of a lot of different variables. But it's the low rate nationally and 5% in 14 days, which are both, I think, when you compare them to other states, it's a pretty short period of time and a pretty high percentage compared to other states. It is a short period of time, but it is a period of time that courts have affirmed as constitutional. Courts have affirmed 5%. And what happens in that state-by-state comparison is you can't look at the petitioning versus petitioning and ignore everything else. Petitioning is just one of three methods of ballot access in Connecticut. A candidate doesn't have to position if they get the party's endorsement at the convention or get 15% of delegate votes in any single vote at the convention. They don't have to get 15% in any single vote. And candidates do get 15% every election cycle and appear on the ballot. And candidates do satisfy the petitioning requirements, and that includes the 5% and the 2%. Can you address his argument that if Connecticut chooses to have primaries, then they can't have severe burdens within the primaries themselves, that the fact that you may be able to qualify through these other methods, he's suggesting that distinguishes Lopez-Torres. Lopez-Torres didn't have a system where New York had primaries as an alternative. What's your response to that? My response to that is LaRouche answers that question. And LaRouche says that if any one method of ballot access is sufficient, then additional methods cannot be a severe burden. And that goes to the burden analysis. He's suggesting primaries are different. LaRouche was media recognition with some category, if you've got enough media recognition. Well, it was media recognition or petitioning. And the court did analyze whether the petitioning was valid and said that the media recognition beyond the petitioning was simply additive. So you're suggesting that if Connecticut, if nobody ever qualified ever under the primary system, then you had to get, you can make the percentage as high as you want, some crazy number, 40%, that we would still have to just say, well, they still have the convention, so that's constitutional? Well, LaRouche says that for the severe burden it would be. But, however, you still have to get to the balancing. And LaRouche also says that the additional ballot access measures can't be wholly irrational. And in the example it gives is a coin toss. And there may be a point where the signature requirement is so high that it's not rationally related to the state's interest. But that's not the case here. Five percent hasn't been held to be too high. Five percent is a percentage that candidates do attain. They do suggest that it's irrational to have five percent versus two percent. Can you speak to that? Why would it make sense to have such a different percentage statewide versus assembly or state senate? Well, the state could have achieved a similar objective in a different way. So rather than having five percent with a cap. Now, for independent candidates or minor party candidates that are petitioning onto the general election ballot, there's a one percent ballot access requirement with a flat cap of 7,500 signatures. So one percent or 7,500, whichever is less. Here, rather than doing that, in acknowledgment of the fact that a statewide office has vastly more people in it, so potentially more enrolled party members, the state made the determination that two percent would be sufficient. Whereas for a state senate district or a state assembly district, five percent was the necessary number. Now, that under five percent, certain state assembly districts still only have to gather as few as 12 signatures. So anything lower could be almost a nonsensical number for a petitioning requirement. And I will point out that plaintiffs have not presented evidence beyond their own candidacies where they did gather more signatures that were necessary that reasonably diligent candidates don't get on the ballot. And, in fact, they engaged in no discovery to seek that information. And at summary judgment, they were required to put forth evidence, not simply speculation as to why Connecticut's ballot access numbers aren't higher. Do you have an explanation as to why Connecticut is last? No, Your Honor, we don't. I mean, what we don't have in this case is evidence that candidates are trying to get on the ballot and don't get on the ballot. No, I'm not saying that that would be a deciding factor. Of course, I don't necessarily believe that. I'm just, we hear that statement made over and over again, and even some of the relevance seems interesting. Certainly an interesting fact, Your Honor, but not necessarily just positive fact in this case. And the information is not judicially noticeable information in the manner that it was presented to the court. The plaintiff who presented himself as an expert in this case says in his own expert report that he gathered that information from Ballotpedia, hardly a source from which judicial notice may be taken. Granted, I do agree that to the extent that there are statutes that are governing what the ballot access requirements are, this court could take judicial notice of that, but not to be effective in terms of the analysis, not in a vacuum, not simply this is what the petitioning requirement is, because that doesn't determine whether another state's ballot access requirements are similar to Connecticut's, because you have to look at the entire ballot access scheme and not simply one factor in it, in order to determine whether there's a severe burden. He does point to filing fee statutes regarding filing fees as well as petitioning mechanisms that are ascertainable in the statute books. Yes, but other states also, most states do not have a convention route, as Connecticut does, and there really isn't any comparison to how Connecticut's convention routes to ballot access, either by endorsement or by 15 percent, would factor into that. And that's why that can't be, should not be considered, because it would require an expert to kind of make that qualitative comparison of how, unlike ballot access requirements, would compare in terms of degree difficulty. And that's why that's not the proper analysis in these cases. The proper analysis is whether, in Connecticut, a reasonably diligent candidate could get on the ballot, and here they do by all three ballot access avenues. So I take it you don't contest, actually, the data showing Connecticut pulling up the rear in all these measures. We don't concede it simply. It was excluded, and therefore the state did not put forth evidence related to that information to counter that information. You did have expert testimony that you presented, right, that the court accepted? No. So the plaintiffs challenged the testimony of Director of Elections Theodore Bromley for Connecticut that certain conclusions he reached related to how difficult it would be to gather volunteer say, that they found that that wasn't based on personal knowledge, based on his declaration, and therefore it was excluded, but not expert testimony related to state comparative analysis, because we don't think that that's relevant to the inquiry in this case. In the record, how did you establish what the state's articulated interests were in the balancing, the Anderson-Burdick balancing? That came in through the declaration of Theodore Bromley, and that's what the court relied on. The court cited two provisions in that declaration, and the burden is not high. When there's no severe burden, there isn't a high burden for the state to put forth evidence. It's fairly deferential in that instance, and we feel that that has been satisfied, and plaintiffs put forth no evidence that would cause a genuine issue of material fact related to that. All right. Thank you, Ms. Nunley. All right, Mr. Taubes, you have three minutes to move on. All right. Opposing counsel and I are very friendly advocates with each other, so there's no pride there. So I just wanted to address one thing. I think that the state adequately gives some explanation for 2% versus 5%. It's a bigger area, so we have a smaller percentage. But what we never have seen any justification for is why you have 42 days to get the 2%, but only 14 days to get the 5%. And so the district court said it took 11 volunteers per day over those 14 days. That's 156 volunteer days over 14 days. I thought there was some issue because you have to wait until the convention ends, and then the primaries take place, I think, in August, and that there's just only so many days, right? Well, the Congress candidates are allowed to start collecting signatures before the convention, whereas for some reason, which has never been explained and is not in the legislative history, the state senate candidates are only allowed to gather the signatures after their convention. And this is nowhere in the party rules that were presented to the district court. They don't want them to bypass the convention? They want the conventions to remain relevant? It's possible, but the party rules in the district court 72-3, S.A. 019 to S.A. 045, there's actually nothing in the party rules about how much time people should be allowed to have to gather signatures. There is a mention that you need to have a certain amount of signatures to get on the ballot, but this 14-day crunch, look, turkeys don't like to vote for Christmas. The state legislators were the ones voting on this, not U.S. Congress people. So they were fine with allowing people to have their First Amendment rights to get on the ballot against people who didn't have a vote on this, but the state senators locked up their own positions, and that is unconstitutional. That is what we are challenging. They made it hard to challenge themselves through this law, and they didn't just keep the conventions. I know, but Mr. Gottlieb did it, but for 32 invalidated signatures, he did it, right? They were invalidated because of these very strict laws, the motorization of each page. I'm not just showing you that the 14 days, even if it is difficult. It leaves no margin for error. If one day is rainy in the middle of summer, or if it's 103 degrees, now you only have 13 days to collect these signatures. And furthermore, Mr. Gottlieb was reasonably diligent, and Mr. Bartlett was too. There is plenty of evidence that reasonably diligent people simply cannot get onto the state senate ballot because of this 14-day restriction to get the 5% of the party members within that district, which can be up to 156 volunteer days of effort. A reasonably diligent person cannot muster 156 people giving one shift, or 11 people giving 14 straight shifts in the middle of summer. That is a severe burden, and there's never been a justification for why that should be different for U.S. Congress, and that's why this case is like Illinois State Board of Elections against Socialist Workers Party, where different offices within Illinois had different requirements without justification. So the state legislators, they impermissibly discriminated against the First Amendment rights of people trying to get on the ballot and challenge them, and that's why this court needs to intervene. Thank you. Thank you, Mr. Talbots. Thank you, Ms. Nunley. We'll reserve the decision. Have a good day. That completes the business of the court today. With thanks to Ms. Beard, our courtroom deputy, I'll ask that she adjourn court. Court is adjourned.